DAVID METZGER TRUST, JACOB METZGER, TRUSTEE, PETITIONER
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

METZGER DAIRIES, INC., PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 8824–77, 8856–77, 6990–79.    Filed January 12, 1981.

*Herbert S. Kendrick* and *Don C. Stephenson,* for the
petitioners.
*Thomas G. Potts,* for the respondent.

## OPINION

DAWSON, *Judge*: In these consolidated cases respondent deter-
mined the following deficiencies in the Federal income taxes of
petitioners:

| Petitioner | Docket No. | Year | Amount |
|---|---|---|---|
| David Metzger Trust | 8824–77 | 1973 | $292,977.47 |
| Metzger Dairies, Inc. | 8856–77 | 1973 | 2,106.86 |
| | | 1974 | 24,856.38 |
| Metzger Dairies, Inc. | 6990–79 | 1975 | 6,684.68 |

Because of concessions, the remaining issues for decision are:

(1) Whether family hostility among the shareholders of Metzger Dairies, Inc., who are also beneficiaries of the David Metzger Trust, nullifies the attribution rules of section 318[1] so that a redemption by the corporation of stock owned by the trust qualifies as an exchange under section 302(b)(1) or 302(b)(3).

(2) Whether a waiver agreement filed by the trust pursuant to section 302(c)(2)(A)(iii) was effective to waive the trust-beneficiary attribution rules of section 318(a)(3) so that the trust may treat a redemption of stock as a complete termination of a shareholder's interest under section 302(b)(3).

(3) Whether Metzger Dairies, Inc., may, notwithstanding section 267(a)(2), deduct accrued interest expenses owed to a cash method taxpayer but which were not actually paid until more than 2½ months after the close of its fiscal year where hostility existed between the payee and her brother, who owned more than 50 percent of the corporation's stock.

These cases were submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulations of fact and attached exhibits are incorporated herein by this reference. The pertinent facts are set forth below.

Jacob Metzger, Trustee of the David Metzger Trust (sometimes hereinafter referred to as the Trust) was a legal resident of Van Zandt County, Tex., when the Trust filed its petition herein. Metzger Dairies, Inc. (MDI), had its principal office in Dallas, Tex., at the time it filed its petition herein.

David Metzger formed MDI in 1946 to operate a dairy business in Dallas, Tex. He had earlier created the David Metzger Trust for his family, with his wife, Nora, as life income beneficiary, and his three children, Jacob Metzger, Catherine Staacke, and Cecelia Jane Frew, each as one-third remaindermen. This trust later became a shareholder of the corporation.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect in the years at issue unless otherwise indicated.

After the death of David Metzger in 1953, Jacob assumed managerial control over MDI, installing himself as chairman of the board, and his son, David Metzger II (David II), as president, while Jacob's sisters, Catherine and Cecelia, were directors of the corporation. During the early years of Jacob's term as chief executive officer, the corporation experienced financial success and was able to distribute dividends to its shareholders: Jacob, Catherine, and Cecelia, trusts established for each of them, Nora, and the David Metzger Trust.

During the 1960's, however, corporate earnings declined and dividends were not distributed. When this happened, Catherine and Cecelia became angry and on numerous occasions accused Jacob and his son, David II, of incompetent management; raising their already high salaries at a time when the corporation was unprofitable; spending too much time golfing, hunting, and fishing; and causing MDI to sustain substantial losses by its acquisition of another corporation solely to prevent a default by the latter on a promissory note owed to a Dallas bank of which Jacob was a director. Although Catherine and Cecelia were on the board of directors, they did not attempt to use their directorial voting power to change the management policy or to force a distribution of dividends because (1) Jacob as trustee of the David Metzger Trust voted and controlled its stock holdings in MDI, (2) they believed Jacob controlled the shares owned by their mother, Nora, by virtue of his ability to influence her decisions regarding the family business, (3) they were kept uninformed by Jacob regarding the business and thus lacked sufficient knowledge to suggest or demand corrective measures, and (4) Jacob threatened to use legal ploys to disinherit them from their father's trust should they attempt to overrule his managerial decisions and policies. As a result, Catherine and Cecelia found the meetings of the board of directors to be extremely unpleasant and distasteful.

Catherine also deeply resented Jacob because of his poor treatment of her son, Fred Staacke, Jr. (Fred Jr.). During the relevant years, Fred Jr. was president of Metzger Dairy of San Antonio, Inc. (MSA). This corporation was engaged in the dairy business in San Antonio, Tex., and its stock was owned, but for minor variations, by the same parties and in the same percentages as MDI. Although Fred Jr. was nominally president, his uncle Jacob perceived himself to be the ultimate authority of

MSA and proceeded to belittle Fred Jr.'s management, reverse his business decisions, make unannounced inspections, and complain about the company's profitability while refusing to assist in soliciting new customers. Catherine believed Jacob's persistent harassment and humiliation of her son drove Fred Jr. into alcoholism.

Cecelia held an animosity toward Jacob and Catherine because she resented the fact that, although MDI and MSA discontinued paying dividends, Jacob's family (through the employment by MDI of Jacob and David II) and Catherine's family (through the employment by MSA of Fred Jr.) continued to profit from the family businesses. On several occasions, Cecelia suggested that either MDI, Jacob, or Catherine buy her stock, but they refused on the grounds that a fair market value for the shares could not be determined. Sometime thereafter, Stop & Go Food Stores, Inc., an unrelated corporation, offered to purchase the stock of MDI, and Cecelia strongly urged that the offer be accepted. When the offer was rejected (or withdrawn for lack of acceptance), the enmity between Cecelia, on one side, and Jacob and Catherine, on the other side, was greatly aggravated. Cecelia became infuriated when she discovered that she had been purposely excluded from a meeting between them to make a determination as to their continued and future ownership of MDI and MSA. This was not the only occasion that pitted Cecelia against Jacob and Catherine. When the family was deciding to form the Mr. M Corp. of San Antonio, Inc. (Mr. M Corp.), to engage in the ownership and operation of retail convenience stores in San Antonio, Tex., Cecelia suggested it be formed as a wholly owned subsidiary of MDI. Instead, Jacob and his son, David II, and Catherine and her son, Fred Jr., decided the stock should be subscribed for and purchased individually. Because Cecelia was not employed by either of the existing corporations and received no dividends from them, she was financially unable to invest in the new business. Thus, when Jacob, David II, Catherine, and Fred Jr. thereafter profited from the success of Mr. M Corp., Cecelia felt she had been betrayed by her brother and sister.

In addition to matters relating to the business of the three corporations, Jacob, Catherine, and Cecelia fought over other issues. Heated disputes constantly arose among them over whose family could use the family farm, a large estate containing a

lake, recreational area, and multiple residences, which they owned in undivided interests along with their mother. In other instances Cecelia and Catherine, each being one-third remaindermen of the David Metzger Trust, accused their brother Jacob, the sole trustee, of mismanaging the trust corpus by investing it in securities which produced only minimal income. When they demanded the trust be turned over to a professional investment adviser, Jacob refused to relinquish his position.

Jacob had felt considerable resentment toward his two sisters since the occasion when their mother, Nora, decided to make gifts to her grandchildren of her principal estate. Jacob, having only two children, believed that Nora's estate should be divided into thirds and then distributed per stirpes to Catherine, Cecelia, and himself. Catherine, having three children, and Cecelia, having four, convinced their mother to distribute her estate per capita to the grandchildren.

In another incident, Cecelia, who lived in Oklahoma City, Okla., accused Jacob of failing in his responsibility of caring for their mother when she became of frail health. The feuding over this matter resulted in Catherine's moving their mother to a Houston, Tex., nursing home.

The rancor among Jacob, Catherine, and Cecelia struck a nadir in 1972 when Jacob accused Catherine and Fred Jr. of obtaining voting control of Mr. M Corp. by sharp and perfidious practices. Such passing of control occurred when Laura Metzger, upon her divorce from David II, received a portion of Mr. M Corp. stock owned by David II. David II believed that his former wife would quickly exhaust her cash resources and need more money, at which time he planned to reacquire the stock for a fraction of the value at which he conveyed it to her. However, when Fred Jr. learned that Laura owned the stock, he schemed to acquire it first. Fred Jr. arranged for a business associate to procure the stock from Laura and to hold it for, and on behalf of, Fred Jr. as a nominee. The associate soon purchased Laura's stock with funds loaned to him by Fred Jr., who had borrowed the money from his mother, Catherine.

When Jacob and David II discovered the stock acquisition, they were incensed, believing they had been betrayed. Jacob immediately contacted Cecelia and Catherine and together they concluded that the business of MDI, MSA, and Mr. M Corp. could no longer be operated in the familial manner in which it had

been in the past. After lengthy negotiations, they agreed that Jacob and his family would own MDI, Catherine and her family would own MSA and Mr. M Corp., and Cecelia and her family would receive cash compensation for their interests in such corporations. To accomplish this, they planned to cause MDI to redeem all its stock owned by Cecelia, Catherine, and the David Metzger Trust. The trust was included in the redemption because under the terms of the trust instrument, the stock it held in MDI would, upon the death of the life income beneficiary, Nora, pass in equal shares to the remaindermen who were attempting to separate their future business and familial relations. Pursuant to the plan, MSA and Mr. M Corp. redeemed their stock from all shareholders other than Catherine and her family.

The price at which each stock issue was redeemed was based on the price previously offered by Stop & Go Food Stores, Inc. Although Cecelia argued it was less than fair market value, she finally accepted such price "in order to get free of Jacob Metzger." Just when the redemption negotiations were about to be concluded, Jacob announced he would not sign the agreement unless Catherine and her children and Cecelia and her children all agreed to sell him their interests in the family farm at approximately one quarter of the then fair market value. This last minute demand initiated bitter feuding, but in the end, the affected parties acquiesced in order to sever all ties of whatever nature with and among one another.

The trust and respondent have stipulated that (1) the principal and primary reason underlying the redemption of stock by MDI was the hatred and discord existing among Jacob, Catherine, and Cecelia, (2) the redemption was not principally or primarily motivated to realize a profit on their stock or to receive undistributed earnings from prior years, and (3) both before and after the redemption, Jacob, Catherine, and Cecelia would not have acted in concert or for the benefit of one another in connection with the redemption of the stock of MDI, the business policies and operations of MDI, or otherwise. On the date of the redemption, MDI had no current earnings and profits, but had accumulated earnings and profits of $1,815,060.77, of which 23.90889 percent was allocable to the distribution to the David Metzger Trust.

On or about January 22, 1973, the agreed-upon redemptions

took place. As of January 1, 1973, MDI had outstanding 3,000 shares of common stock which were owned as follows:

| Shareholder | Number of shares |
|---|---|
| David Metzger Trust | 420 |
| Nora Metzger | 420 |
| Jacob Metzger | 600 |
| Trust for Jacob Metzger | 120 |
| Catherine Staacke | 600 |
| Trust for Catherine Staacke | 120 |
| Cecelia Jane Frew | 600 |
| Trust for Cecelia Jane Frew | 120 |
| Total | 3,000 |

Subsequent to the redemption, the remaining shares of stock then outstanding were owned as follows:

| Shareholder | Number of shares |
|---|---|
| Jacob Metzger | 600 |
| Trust for Jacob Metzger | 120 |
| Trust for David Metzger II (son of Jacob Metzger) | 294 |
| Trusts for Nan Metzger (daughter of Jacob Metzger) | 207 |
| Total | 1,221 |

On February 10, 1976, Jacob, as trustee of the David Metzger Trust, delivered to an authorized agent of the Internal Revenue Service an agreement referred to in section 302(c)(2)(A)(iii) and section 1.302–4, Income Tax Regs. Subsequent to the redemption of all of its 420 shares, the trust has not acquired any MDI stock nor has it held any interest in the corporation as officer, director, or employee.

In partial payment for the 600 shares redeemed from Cecelia, MDI executed a promissory note to her in the amount of $627,110.53, payable in three equal annual installments, plus interest, beginning January 22, 1974. In accordance with its accrual method of accounting, the corporation claimed deductions for accrued interest expense with respect to the above-described promissory note in the amount of $32,167.28, $31,533.07, and $13,926.46 for its fiscal years ended September

30, 1973, September 30, 1974, and September 30, 1975, respectively. These interest expenses were not paid to Cecelia within 2½ months after the close of MDI's fiscal years. Rather, the amounts were paid on January 21, 1974, January 7, 1975, and January 5, 1976, respectively. Cecelia reported income in accordance with the cash receipts and disbursements method of accounting for the calendar years 1974, 1975, and 1976. Accordingly, the accrued interest expense in the amount of $32,167.28, claimed as a deduction by MDI for its fiscal year ended September 30, 1973, was included in income by her for the calendar year 1974. Similarly, the accrued interest expense in the amount of $31,533.07, claimed as a deduction by MDI for its fiscal year ended September 30, 1974, was included in income by her for the calendar year 1975. The accrued interest expense in the amount of $13,926.46, claimed as a deduction by MDI for its fiscal year ended September 30, 1975, was included in income by her for the calendar year 1976.

## Issue 1

The first issue presented is whether the trust is entitled to exchange treatment, under section 302, on a stock redemption caused by family hostility among the individual shareholders of the redeeming corporation, who were also beneficiaries of the trust. As a general rule, distribution of property by a corporation to its shareholders is treated, pursuant to sections 301 and 316,[2] as a dividend out of earnings and profits to the extent of such earnings. One exception to this general rule is made for certain distributions in redemption of a corporation's stock. Section 302(a) treats such distributions as "payment in exchange for the stock," taxable as capital gain, if the requirements of one of the four paragraphs of section 302(b) are met. The paragraphs

---

[2]Under sec. 301, that portion of a distribution which is considered a dividend under sec. 316 is ordinary income; that portion which is not a dividend is treated as return of capital to the extent of the shareholder's basis in the stock; and any excess over basis is treated as gain from the sale or exchange of property.

On Jan. 22, 1973, MDI distributed $585,303.25 to the David Metzger Trust in redemption of 420 shares of MDI. On that date, MDI had no current earnings and profits under sec. 316, but it did have $1,815,060.77 of accumulated earnings and profits. The parties have stipulated that if the redemption were deemed, pursuant to sec. 302(d), to be a distribution to which sec. 301 applied, then $433,960.88 should be treated as a dividend under sec. 301(c)(1), and $151,342.37 should be applied to reduce the basis of the stock held by the trust ($231,000) under sec. 301(c)(2).

relevant to this case are (1) and (3). Section 302(b)(1) makes section 302(a) applicable if the redemption is not essentially equivalent to a dividend. Section 302(b)(3) makes section 302(a) applicable if there has been a complete redemption of all of that corporation's stock owned by the shareholder. Section 302(d) provides that if a corporation redeems its stock and if section 302(a) does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

Section 302(c)(1) provides that, except as provided in paragraph (2), the attribution rules of section 318 shall be applied in determining the ownership of stock for purposes of applying the rules of section 302. Section 318(a)(1)(A)(ii) provides, in part, that an individual shall be considered as owning the stock owned by his children. Section 318(a)(2)(B)(i) provides that beneficiaries of a trust shall be considered as owning the stock owned by the trust in proportion to their actuarial interest. Section 318(a)(3)(B)(i) provides that a trust shall be considered to own the stock owned by its beneficiaries who have more than a remote contingent interest. However, under section 302(c)(2), the attribution rules of section 318 are not applicable where there is a complete termination of a shareholder's interest under section 302(b)(3), if certain conditions are satisfied, including the requirement that the distributee file an agreement to notify the Internal Revenue Service of any future acquisition of stock in the redeeming corporation. Sec. 302(a)(2)(A)(iii).

Respondent contends that the redemption was essentially equivalent to a dividend, and thus is taxable as a dividend under sections 302(d) and 301 because the trust, after application of the attribution rules, maintained a 100-percent ownership interest both before and after the redemption. Before the redemption, the trust owned 3,000 shares, or 100 percent of the stock of MDI. It owned directly 420 shares. In addition, it constructively owned, by reason of the attribution rule of section 318(a)(B)(i), the shares owned by its beneficiaries: Nora, 420 shares; Jacob, 600 shares; Catherine, 600 shares; and Cecelia, 600 shares.[3] Moreover, the trust also constructively owned 360 shares of stock which were held in separate trusts for Jacob, Catherine, and Cecelia. Section 318(a)(2)(B)(i) attributes the 120 shares in

---

[3]There have been no claims made that any beneficiary's interest in the David Metzger Trust is a remote contingent interest under sec. 318(a)(3)(B)(i).

the Jacob Metzger Trust to Jacob, individually, the 120 shares in the Catherine Staacke Trust to Catherine, individually, and the 120 shares in the Cecelia Jane Frew Trust to Cecelia, individually; section 318(a)(3)(B)(i) then reattributes this stock constructively owned by the beneficiaries of the David Metzger Trust to the trust, itself.

At the redemption, the stock owned by the David Metzger Trust (420 shares), Nora (420 shares), Catherine (600 shares), the Catherine Staacke Trust (120 shares), Cecelia (600 shares), and the Cecelia Jane Frew Trust (120 shares) was fully redeemed. No stock owned by Jacob or the Jacob Metzger Trust was redeemed.

After the redemption, there were 1,221 outstanding shares of MDI. Respondent argues that all the shares were attributable to the David Metzger Trust. The 600 shares owned by Jacob are attributed to the Trust by section 318(a)(3)(B)(i). The 120 shares in the Jacob Metzger Trust are attributed to Jacob by section 318(a)(2)(B)(i), and then from Jacob to the David Metzger Trust by section 318(a)(3)(B)(i). In like manner, the 501 shares held in trust for Jacob's children, David II and Nan, are attributed to them by section 318(a)(2)(B)(i), and then from them to Jacob by section 318(a)(1)(A)(ii), and then from Jacob to the trust by section 318(a)(3)(B)(i). Thus, respondent contends that the David Metzger Trust also constructively owned 100 percent of the outstanding stock after the redemption.

The trust contends that the redemption was not essentially equivalent to a dividend, and thus qualifies as a distribution in exchange for the stock pursuant to sections 302(a) and 302(b)(1). This is so, the trust argues, because (1) the redemption was caused by extreme discord among the individual shareholders of MDI, (2) the stockholders had no motive to realize a profit on their stock or to receive accumulated earnings and profits at capital gains rates, and (3) the hostility among the relevant parties was so severe that they would not have acted in concert or for the benefit of each other in connection with the redemption, or with regard to the business policies and operations of MDI.

Respondent also contends that the redemption failed to qualify as a complete redemption under section 302(b)(3) because ownership of the stock of the corporation individually owned by Jacob after the redemption should be attributed to the trust under section 318(a)(3). The trust has a two-pronged rebuttal to

this. First, it contends that the stock should not be attributed to it because the redemption was occasioned by familial discord. Second, it argues that the exception to the attribution rules provided for in section 302(c)(2) applies to them because the trust complied with the requirements of section 318(c)(2)(A)(i) and (ii), and filed the waiver agreement specified in section 318(c)(2)(A)(iii).

We are once again confronted with the difficult question of whether a distribution, coupled with a redemption, of stock is "essentially equivalent to a dividend."[4] This is ordinarily a question of fact. *United States v. Fewell*, 255 F.2d 496 (5th Cir. 1958); *Wright v. United States*, 482 F.2d 600 (8th Cir. 1973); sec. 1.302–2(b), Income Tax Regs. The leading case interpreting section 302(b)(1) is *United States v. Davis*, 397 U.S. 301 (1970). In the *Davis* case, Davis, his wife, son, and daughter each owned 25 percent of a corporation's common stock. In an earlier year, Davis purchased an entire issue of preferred stock for $25,000 to provide the corporation with sufficient capital to qualify it for a loan. Upon retirement of the loan, the corporation redeemed Davis' preferred stock for exactly his original investment, $25,000. Mr. Davis maintained the position that the attribution rules did not apply to a 302(b)(1) redemption, thus, the distribution was not pro rata on an *actual* ownership basis and hence not essentially equivalent to a dividend. He also claimed the redemption was occasioned by a valid non-tax-avoidance motive and a bona fide business purpose and thus should not be treated as a dividend.

In rejecting the taxpayer's arguments, the Supreme Court held: (1) The contructive ownership rules of section 318 apply to dividend equivalency determinations in section 302(b)(1); (2) redemptions of stock of a sole shareholder, including a "constructive" sole shareholder, are "always 'essentially equivalent to a dividend' " under section 302(b)(1); (3) business purpose is irrelevant in determining dividend equivalency under section 302(b)(1); and (4) in order to avoid dividend equivalency, the

---

[4]This problem has been called "exasperating," *Lewis v. Commissioner*, 35 T.C. 71, 76 (1960), "vexing," *Bradbury v. Commissioner*, 298 F.2d 111, 114 (1st Cir. 1962), "the morass created by decisions," *Ballenger v. United States*, 301 F.2d 192, 196 (4th Cir. 1962), and "nightmarish," *United States v. Fewell*, 255 F.2d 496, 499 (5th Cir. 1958); see also *Wilson v. United States*, 154 F. Supp. 341, 342–343 (N.D. N.Y. 1957), affd. 257 F.2d 534 (2d Cir. 1958).

redemption must result in a "meaningful reduction in the shareholder's proportionate interest in the corporation."[5]

Respondent contends that (1) after application of the attribution rules, the trust was the sole shareholder of the corporation both before and after the redemption, (2) the non-tax-avoidance purpose of separating the business dealings of the feuding stockholders and members of the board of directors of MDI is irrelevant to the section 302(b)(1) determination; and (3) the redemption resulted in no meaningful reduction in the trust's interests in MDI.

The trust argues that if the attribution rules are not taken into account, it is not a sole shareholder before or after the redemption, hence the distribution would not be pro rata on an *actual* ownership basis, therefore not essentially equivalent to a dividend within the meaning of section 302(b)(1). It relies on *Haft Trust v. Commissioner*, 510 F.2d 43 (1st Cir. 1975), vacating and remanding 61 T.C. 398 (1973) and 62 T.C. 145 (1974) (supplemental opinion), for the proposition that the existence of family hostility is a factor to be considered in the mitigation of the constructive ownership rules of section 318 in determining dividend equivalence under section 302(b)(1). The *Haft Trust* case concerned four trusts established by the maternal grandfather, one trust for each of the children of Burt and Marcia Haft. The sole asset of each trust was 25,000 shares of stock of Haft-Gaines Corp. Before the redemption, there were 500,000 shares of Haft-Gaines Corp. stock outstanding. Burt Haft owned 100,000 shares directly, 33,333⅓ shares constructively through a trust of which he was a beneficiary, and 100,000 shares constructively through four trusts set up for his children (the 25,000 shares of stock of each trust being attributed to each child, then reattributed from each child to Burt), for a total of 233,333⅓ shares, or approximately 47 percent of the outstanding shares. Each trust owned 25,000 shares directly, and 133,333⅓ shares constructively (by attribution from Burt of his directly and constructively owned stock to each child, and then from each child to his or her respective trust), for a total of 158,333⅓ shares or approximately 31⅔ percent of the 500,000 shares of outstanding stock.

---

[5]See generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.24 (4th ed. 1979).

As a result of bitter acrimony between Burt and Marcia Haft, divorce proceedings were begun. During the course of the divorce, it was decided to separate the direct financial interests of Burt's corporation from the trusts established by Marcia's father. Accordingly, the corporation redeemed all of the shares owned by each of the four trusts.

After the redemption, there were 400,000 shares outstanding. Each trust owned no shares directly, but owned 133,333⅓ shares constructively (again, by attribution of 133,333⅓ shares, owned directly and constructively by Burt, to each child, and then from each child to his or her respective trust), for a total of 133,333⅓ shares or 33⅓ percent of the 400,000 shares of outstanding stock. Because of the attribution rules, each of the four trusts owned more shares after the redemption of its directly owned shares than before the redemption.

The Commissioner determined the proceeds of the redemption to be essentially equivalent to a dividend because there had not been a meaningful reduction of each trust's proportionate interest in the corporation according to the rule of *United States v. Davis*, 397 U.S. 301 (1970). The trusts petitioned this Court arguing that attribution should not be applied when there has been a "family fight" and hostility exists among the members of the family. In holding against the taxpayers, we stated:

A careful review of the opinion of the Supreme Court in *Davis* convinces us that the petitioners' argument is inconsistent with the statements and rationale of that opinion. Before the enactment of the 1954 Code, the attribution rules were sometimes applied, and sometimes not applied; to avoid that uncertainty, section 302 expressly made the attribution rules applicable for purposes of determining whether a distribution in redemption should be treated as a dividend. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A96 (1954). The Court relied upon "the plain language of the statute" in concluding that the attribution rules were applicable. 397 U.S. at 306. The Court was obviously convinced that in enacting the rules of section 302, Congress sought to provide definite and specific rules and to avoid the uncertainties which had arisen under the earlier law. * * *

If the applicability of the attribution rules depended upon the feelings or attitudes among the members of a family, it would then be necessary to inquire into whether there was hostility or animosity among them, whether such discord was serious, and whether it would actually or likely impair the ability of one member of the family to influence the conduct of other members. By the terms of the statute, the attribution rules are applicable irrespective of the personal relationships which exist among the members of a family, and an interpretation of the statute which made their applicability depend upon whether there was discord among the members of the family—or the extent of

any such discord—would frustrate the legislative objective and would be clearly inconsistent with the language and the rationale of *Davis*. * * * [61 T.C. at 403].

The trusts appealed our decision to the First Circuit which analyzed the law differently. *Haft Trust v. Commissioner, supra*. The Court of Appeals interpreted our opinion in *Estate of Squier v. Commissioner*, 35 T.C. 950 (1961), as embracing the principle that family discord could belie the community-of-interest rationale of the attribution rules, and their earlier opinion in *Bradbury v. Commissioner*, 298 F.2d 111 (1st Cir. 1962), as approving it:

> While these attribution rules are generally applicable to § 302(b)(1), see, Thomas G. Lewis, 35 T.C. 71 (1960), their imposition is not inflexible and if it can be demonstrated that discord exists in a family relationship which would make attribution unwarranted, they will not be applied. Compare, Estate of Arthur H. Squier, 35 T.C. 950 (1961) with Herbert C. Parker, T.C. Memo. 1961–176 * * * [298 F.2d 111, 116–117 n. 7.]

It construed the *Davis* opinion as not requiring that the factual inquiry end after taking into account the attribution rules. The Court also relied on section 1.302–2(b), Income Tax Regs., for the rule that "one of the facts to be considered" in making the determination of dividend equivalency is the constructive stock ownership caused by section 318. It further interpreted the *Davis* requirement for dividend nonequivalency of a *"meaningful reduction* of the shareholder's proportionate interest in the corporation" (397 U.S. at 313; emphasis added), as permitting, if not mandating, an examination of the facts and circumstances to determine the effect of the transaction transcending a mere mechanical application of the attribution rules. 510 F.2d at 48. Finally, the appellate court thought that Congress in retaining the "essentially equivalent to a dividend" exception of section 302(b)(1) in the Internal Revenue Code, showed itself willing to tolerate some administrative and judicial inconvenience brought about by inquiries into "the uncertain shifting quagmires of family relationships" for the sake of taxpayer equity. 510 F.2d at 48. On the basis of its analysis, the First Circuit reversed our decision and remanded it for reconsideration of the trusts' claims in light of the facts and circumstances of the case, including the existence of family discord tending to negate the presumption that taxpayers would exert continuing control over the corporation despite the redemption.

The attribution rules of section 318 came into the tax law with the enactment of the Internal Revenue Code of 1954. Their legislative history provides an illuminating background for our examination. In the report of the House Ways and Means Committee to accompany H.R. 8300 (March 9, 1954), the committee stated:

SECTION 311. ATTRIBUTION OF OWNERSHIP [Now section 318.]

Section 311 articulates the circumstances under which ownership of stock by one person shall for the purpose of the sections to which section 311 is specifically made applicable be attributed to such other person. The sections to which section 311 are applicable are the following: 302 * * *

no specific statutory guidance is at present provided for stock ownership in the area of corporate distributions and adjustments. As a result the administration of provision such as section 115(g)(1) [now section 302(b)(1)] of existing law has become clouded with uncertainty by reason of executive application of rules of attribution of ownership. *Your committee intends, through section 311, to remove these uncertainties by providing in the bill precise rules for attribution where this is appropriate.*[6] * * * [Emphasis added.]

Regarding what is now section 302(b)(3), the committee further stated:

A distribution in complete redemption of a shareholder's stock will also result in capital gain. To prevent evasion of the complete redemption test a shareholder is considered as owning stock held by members of his immediate family, or by partnerships, corporations and trusts which he controls. At the present time a possible opportunity for tax avoidance results where redemptions are effected in the case of family-owned corporations. To prevent tax avoidance, but at the same time to provide *definitive rules* for the guidance of taxpayers, your committee has provided *precise standards* whereby under specific circumstances, a shareholder may be considered as owning stock held by members of his immediate family (or by partnerships, corporations, or trusts which he controls). * * * [Emphasis added.][7]

Before the Senate Finance Committee issued its report, it held hearings on the proposed House bill. The Section on Taxation of the American Bar Association filed a statement with the committee in connection with H.R. 8300 which advised:

[Section 318] assumes a unity of action and of interest within the family which is frequently lacking, at least where dependency does not exist. It has been suggested, therefore, that the family should be limited to one's minor

---

[6]H. Rept. 1337, 83d Cong., 2d Sess. A96 (1954), U.S. Code Cong. & Adm. News 4234 (1954).

[7]H. Rept. 1337, *supra* at 36, U.S. Code Cong. & Adm. News 4061 (1954).

children, spouse and other dependants. It is the experience of practicing lawyers that one is consulted far more often with respect to family and partnership squabbles over property than on family plans to avoid income taxes.[8]

The Senate Finance Committee, in its report to accompany H.R. 8300, refused to amend the House bill to accord with the A.B.A. suggestion, stating:

Your committee retained, with modifications noted in (2) below, the following provisions of the House bill which revise existing law with respect to corporate distributions:

* * * * * * *

(h) Provide rules to indicate specific instances when, for purposes of preventing tax avoidance, a person shall be considered to own stock owned by a related person.

(2) CHANGES MADE BY COMMITTEE

* * * * * * *

A distribution in complete redemption of a shareholder's stock will also result in capital gain. However, in order to prevent tax avoidance, your committee follows the rules of the House bill whereby, under specific circumstances, a shareholder may be considered as owning stock held by members of his family (or by partnerships, corporations, or estates, trusts in which he has an interest). * * * [9]

The Senate committee further explained:

SECTION 318. CONSTRUCTIVE OWNERSHIP OF STOCK

This section describes the area in which although in fact transactions related to stock ownership are in connection with a specific individual, ownership of stock is deemed to be in the hands of persons other than the person directly involved. * * *

The area of constructive ownership includes members of the family, persons having interests in partnerships, estates, trusts, and corporations, such partnerships, estates, trusts, and corporations and stock held under an option.

* * * * * * *

In the case of trusts, a similar rule applies, i.e., the beneficiary or grantor is deemed to own his proportionate interest in the stock owned by the trust or estate and the trust or estate is deemed to own all of the stock owned by its beneficiaries or grantors. * * * [10]

The American Law Institute Tax Project, which had made

---

[8]Hearings on H.R. 8300 Before the Senate Comm. on Finance, 83d Cong., 2d Sess. (Part 1), 366 (Apr. 7 and 8, 1954).

[9]S. Rept. 1622, 83d Cong., 2d Sess. (1954), 43–45, U.S. Code Cong. & Adm. News 4674–4675 (1954).

[10]S. Rept. 1622, *supra* at 252–253, U.S. Code Cong. & Adm. News 4890 (1954).

suggestions in February 1954 relating to corporate distributions for the then-prospective Internal Revenue Code of 1954, wrote a summary of its follow-up work for the period 1956–58 wherein it stated:

The stock redemption rules of Code section 302 refer to the redemption of all of the stock "owned" by a shareholder and to distributions disproportionate to the stock "owned" by shareholders. It has long been recognized that the substance of these sections could be defeated where the particular shareholder permitted some of the stock involved to be held by members of his close family or by corporations, partnerships, or trusts in which he had an interest. To meet this difficulty, the tax law has devised rules regarding the attribution of stock ownership. Under these rules stock so distributed among the family or placed in controlled entities is collected and reallocated to the basic shareholder. These rules of attribution rest on certain assumptions, as, for example, that one member of a family can control the stock owned by other members of the family, or rather that whenever the extent of the stock ownership of one member of the family is in issue, it is proper to regard that member as holding all of the shares possessed by the family. Similarly, a partner or a shareholder can be regarded as owning a pro rata portion of the stock held by the entity. *These assumptions obviously have a considerable factual basis in most situations. Further, the burden on tax administration and tax planning would be almost intolerable if these assumptions were treated only as presumptions, with the final issue depending on the particular factual situation.* [Emphasis added.][11]

Finally, the end product of the legislative process, the statute itself makes the application of the attribution rules mandatory:

SEC. 318(a). GENERAL RULE. —For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

(1) MEMBERS OF FAMILY. —

(A) IN GENERAL. —An individual *shall* be considered as owning the stock owned, directly or indirectly, by or for—

(i) his spouse (other than a spouse who is legally separated from the individual under a decree of divorce or separate maintenance), and

(ii) his children, grandchildren, and parents.

---

[11]S. Surrey, "Income Tax Problems of Corporations and Shareholders: American Law Institute Tax Project—American Bar Association Committee Study on Legislative Revision," 14 Tax L. Rev. 1, 50–51 (1958). See also F. Ringel, S. Surrey & W. Warren, "Attribution of Stock Ownership in the Internal Revenue Code," 72 Harv. L. Rev. 209–210 (1958):

"These rules of constructive ownership rest on certain assumptions which are readily supported in the everyday conduct of affairs * * * *Tax administration would be severely handicapped if the rules applied only as presumptions; tax planning, moreover, would be hazardous if it depended on an analysis of the actual relationship in each case. Therefore these assumptions have evolved as statutory rules.* [Emphasis added.]"

\*    \*    \*    \*    \*    \*    \*

(2) ATTRIBUTION FROM PARTNERSHIPS, ESTATES, TRUSTS, AND CORPORATIONS.

\*    \*    \*    \*    \*    \*    \*

(B) FROM TRUSTS. —

(i) Stock owned, directly or indirectly, by and for a trust \* \* \* *shall* be considered as owned by its beneficiaries in proportion to the actuarial interest of such beneficiaries in such trust.

\*    \*    \*    \*    \*    \*    \*

(3) ATTRIBUTION TO PARTNERSHIP, ESTATES, TRUSTS, AND CORPORATIONS. —

\*    \*    \*    \*    \*    \*    \*

(B) TO TRUSTS. —

(i) Stock owned, directly or indirectly, by or for a beneficiary of a trust \* \* \* *shall* be considered as owned by the trust, unless such beneficiary's interest in the trust is a remote contingent interest.

[Emphasis added.]

The language of the statute is clear.[12] Courts do not have the power to repeal or amend the enactments of the legislature even though they may disagree with the result; rather, it is their function to give the natural and plain meaning to the statutes as passed by Congress. *National Life & Accident Insurance Co. v. United States*, 524 F.2d 559, 560 (6th Cir. 1975); *International Trading Co. v. Commissioner*, 484 F.2d 707, 713 (7th Cir. 1973); *Busse v. Commissioner*, 479 F.2d 1147, 1152 (7th Cir. 1973). Some commentators have suggested that it would be better to ignore the attributions rules where family discord is present.[13] But courts should not attempt to rewrite statutes because they feel that the scheme Congress created could be improved upon. *United States v. Calamaro*, 354 U.S. 351, 357 (1957).

It is not the function of a Court to rewrite or amend a statute

---

[12]Other cases have consistently applied the attribution rules of sec. 318. *Title Ins. & Trust Co. v. United States*, 484 F.2d 462 (9th Cir. 1973), affg. 326 F. Supp. 617 (C.D. Cal. 1971); *Fehrs Finance Co. v. Commissioner*, 487 F.2d 184 (8th Cir. 1973), affd. 58 T.C. 174 (1972); *Grabowski Trust v. Commissioner*, 58 T.C. 650 (1972); *Estate of Runnels v. Commissioner*, 54 T.C. 762 (1970).

[13]B. Bittker, "The Taxation of Stock Redemptions and Partial Liquidations," 44 Cornell L. Q. 299, 324 (1959); T. Moore, "Dividend Equivalency-Taxation of Distributions in Redemption of Stock," 19 Tax L. Rev. 249, 254–255 (1964); J. Boyd & M. Boyd, "Family discord may negate attribution rules and allow capital gain treatment of a redemption," 15 Taxation for Accountants 362 (1975); Note, "Family Hostility as a Factor in Determining Constructive Stock Ownership in Corporate Redemptions," 29 Tax Law. 386 (1976); Note, "Stock Redemptions From Close Family Corporations Under Section 302," 47 Minn. L. Rev. 853 (1963); A. Cohen, "Receipts Related to Corporate Equity: Return on Investment or Exchange?" 53 Taxes 824 (1975).

in the guise of construing it. It is the Court's duty to construe and apply the statute as it is written; and if this results in inequity to certain taxpayers, the fault lies in the statute itself and is beyond the power of the Court to correct. *Farmers Tractor & Equipment Co. v. United States*, 224 F. Supp. 391 (E.D. Ark. 1963), appeal dismissed 326 F.2d 971 (8th Cir. 1964). Congress might have added a greater family-fight exception to the attribution rules than it did when it eliminated, under section 318(a)(1)(A)(i), attribution from a spouse who is legally separated from the individual under a decree of divorce or separate maintenance, but it did not. Our judicial function is limited to applying statutes on the basis of what Congress has written, not what Congress might have written. *Youakim v. Miller*, 562 F.2d 483, 487 (7th Cir. 1977).

Although section 318 assumes, as the A.B.A. Section on Taxation pointed out to the Senate Finance Committee, a "unity of action and of interest within the family which is frequently lacking," a Court should not make an exception to a statutory rule on the basis of that Court's determination that Congress established the rule on the basis of a faulty set of assumptions. *In re Continental Investment Corp.*, 586 F.2d 241 (1st Cir. 1978).

The legislative history (*supra* p. 56) clearly shows the intention of Congress to provide *"definitive rules* for the guidance of taxpayers, [and] * * * *precise standards* whereby under certain circumstances a shareholder may be considered as owning stock held by members of his immediate family (or by * * * trusts which he controls)." Congress sought to remedy the then-existing law which had "become clouded with uncertainty by reason of executive application of rules of attribution of ownership, * * * by providing in the bill *precise rules* for attribution where this is appropriate." (Emphasis added.) Only the most compelling demonstration of a contrary legislative intent could persuade this Court to ignore the plain words of the statute. *United States v. Le Beouf Bros. Towing Co.*, 537 F.2d 149, 152 (5th Cir. 1976). The legislative history of the attribution rules can hardly be called contrary to the plain words of section 318.

This does not mean that evidence of family discord is irrelevant to the question of dividend equivalency under section 302(b)(1). It does have a role, albeit limited. In the *Davis* case the Supreme Court analyzed Mr. Davis's stockholdings to determine

if there had been a "meaningful reduction" of his proportionate interest in the corporation "*after* application of the attribution rules." *United States v. Davis*, 397 U.S. 301, 313. (Emphasis added.) Thus, the Court sets forth the order of analysis. First, the attribution rules are plainly and straightforwardly applied. Second, one looks to see if there has been a *reduction* in the stockholder's proportionate interest in the corporation. If not, as in the situation of Mr. Davis (who owned only 25 percent directly, owning the other 75 percent constructively through attribution from his wife, son, and daughter), then a Court need not proceed any further because there being no change in the stockholder's interest, dividend equivalency must follow.[14] If there has been a reduction, then a Court should proceed to examine all the facts and circumstances to see if the reduction was *meaningful* for the purposes of section 302. At this point, family hostility becomes an appropriate factor for consideration.

Two arguments have been used to raise the family hostility factor prematurely in the process of determining dividend equivalency. The first involves a Treasury regulation; the second concerns the issue of corporate control. Section 1.302–2(b), Income Tax Regs., states:

> The question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case. One of the facts to be considered in making this determination is the constructive stock ownership of such shareholder under section 318(a).

The regulation has been misinterpreted as meaning constructively owned stock could be disregarded under certain circumstances, such as family discord, in determining whether a meaningful reduction in the stockholder's proportionate interest in the corporation has resulted from the redemption. The calculation under this thesis must therefore relate only to the change in actual stock ownership. To treat constructively owned stock different from actually owned stock for section 302(b)(1) purposes would be the same as ignoring the attribution rules in

---

[14]As the Supreme Court stated:

"After application of the stock ownership attribution rules, this case viewed most simply involves a sole shareholder who causes part of his shares to be redeemed by the corporation. We conclude that such a redemption is *always* 'essentially equivalent to a dividend' within the meaning of that phrase in § 302(b)(1) * * * [*United States v. Davis*, 397 U.S. 301, 307 (1970). Emphasis added.]"

the first place. This is clearly contrary to the plain meaning of the statute and its legislative history.

Some cases[15] and commentators[16] suggest that where family hostility exists, the concept of "interest" in a corporation can be broken down into two components, ownership and control, for purposes of applying or not applying the attribution rules in determining dividend equivalency. Under such a theory a stockholder, who before the redemption owned 100 percent of a corporation, actually, and who after the redemption owned no stock, actually, but 100 percent, constructively, could be deemed to have no control over the corporation where the remaining shareholders were unfriendly section 318 relatives or entities. Because his "control" of the corporation went from 100 percent to nothing, the shareholder, according to the theory, had a meaningful reduction in his "interest" in the corporation. This, in effect, ignores the constructively owned stock for the purposes of determining dividend equivalency contrary to the statute, the regulations, the legislative history, and the rule of *Davis. Niedermeyer v. Commissioner*, 62 T.C. 280, 285–86 (1974), affd. 535 F.2d 500 (9th Cir. 1976), cert. denied 429 U.S. 1000 (1976). Although the degree of control of a corporation is a factor to be considered in testing dividend equivalency (*Benjamin v. Commissioner*, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979)), the final determination must take into account constructively owned stock as well as actually owned stock. Such a position is consistent with the effect of attribution in situations where there is no family discord and where the taxpayer, after the redemption, owned no stock, actually, but 100 percent, constructively. In such cases, courts have held the distribution to be essentially equivalent to a dividend. *Lewis v. Commissioner*, 35 T.C. 71 (1960); *Levin v. Commissioner*, 385 F.2d 521 (2d Cir. 1967), affg. 47 T.C. 258 (1966).[17]

Family discord can be a relevant fact to be considered in

---

[15]*Estate of Squier v. Commissioner*, 35 T.C. 950 (1961); *Parker v. Commissioner*, T.C. Memo. 1961-176.

[16]J. Boyd & M. Boyd, "Family discord may negate attribution rules and allow capital gain treatment of a redemption," 15 Taxation for Accountants 362 (1975); Note, "Family Hostility as a Factor in Determining Constructive Stock Ownership in Corporation Redemptions," 29 Tax Law. 386 (1976).

[17]See also *Title Insurance & Trust Co. v. United States*, 484 F.2d 462 (9th Cir. 1973).

determining whether the reduction in the shareholder's interest is meaningful so as to qualify the distribution as not essentially equivalent to a dividend under section 302(b)(1). The Commissioner's revenue rulings pertaining to that section provide a convenient vehicle for illustrating the proper role of such a fact. In Rev. Rul. 75–502, 1975–2 C.B. 111, the Commissioner determined that a redemption of an estate's 250 shares of common stock by a corporation, whose remaining 1,500 shares were equally divided between the estate's sole beneficiary and an unrelated individual, constituted a meaningful reduction of the estate's interest and was not essentially equivalent to a dividend under section 302(b)(1). The Commissioner explained that it was significant that the redemption reduced the estate's voting rights in the redeeming corporation from 57 percent to 50 percent, and also reduced the estate's rights to share in net assets on liquidation. Furthermore, the reduction of the estate's voting rights from 57 percent to 50 percent produced a situation in which the other 50 percent of the voting rights were held by a single *unrelated* shareholder. Had the stock been owned by a brother and sister of the beneficiary, who were not themselves beneficiaries of the estate, and whose stockholdings could not be attributed to the estate or to the beneficiary, the Internal Revenue Service could have argued that the siblings would act in concert, one for the benefit of the other. Thus, the fact that the estate's drop of 7 percent from majority interest to an equal interest might not be meaningful. Here, family discord would tend to show the "hostile relative" should be treated as an unrelated shareholder.

In Rev. Rul. 76–364, 1976–2 C.B. 91, the Commissioner determined that a redemption by a corporation of its outstanding common stock, which resulted in a 4.73-percent reduction of ownership of stock of a taxpayer who previously owned 27 percent of the stock, with the remaining 73 percent being held in equal portions (of 24⅓ percent each) by three unrelated persons, was a meaningful reduction of the taxpayer's interest in the corporation and was not essentially equivalent to a dividend. It was explained that the redemption not only reduced the taxpayer's interest from 27 percent to 22.27 percent (with a corresponding reduction in rights to vote, to earnings, and to share in net assets on liquidation), but also was *meaningful in itself* because it caused the redeemed shareholder to go from a

position that afforded him control of the corporation if he acted in concert with only one other stockholder, to a position where such action was not possible. If all four stockholders had been brothers and sisters, whose stock was not attributed one to another by section 318, the Internal Revenue Service could challenge the redemption on the grounds that the siblings acted in concert, one for the other, thus, although the taxpayer dropped from 27-percent ownership to 22.27 percent, there was no real change. Here, again, family hostility would tend to show that the redeemed shareholder once could have gained control of the corporation by acting in concert with only one sibling, but now was in a position where that was not possible.

In *Fehrs Finance Co. v. Commissioner*, 58 T.C. 174, 185 (1972), affd. 487 F.2d 184 (8th Cir. 1973), cert. denied 416 U.S. 938 (1974), we stated that, in dicta, there might be unusual circumstances where a 10-percent reduction in stock ownership, after attribution, would be material in determining whether there had been a meaningful reduction of the shareholder's proportionate interest. Here, again, family hostility would be a factor to be weighed in the facts and circumstances.[18]

We realize that the application of the law can produce harsh results in certain circumstances. Mr. Davis bought $25,000 of preferred stock so his corporation could qualify for a loan. After the loan was repaid, he sold the preferred stock back to the corporation at its original purchase price. Mr. Davis argued he had a capital gain of zero. Instead, the Supreme Court held he received $25,000 of ordinary income. While we can sympathize with the plight of such taxpayers, as Justice Douglas did in his dissent (*United States v. Davis*, 397 U.S. 301, 314), we observe the Supreme Court has been unwilling to reconsider the harsh effects of the *Davis* decision (*Albers v. Commissioner*, 414 U.S. 982 (1973) (denying certiorari)), thus, we must follow the law.[19]

---

[18]For a discussion of other facts and circumstances, see R. Swennes, " 'Not essentially equivalent to a dividend' exception still viable despite *Davis*," 41 J. Tax. 78 (1974). See also A. Cathcart, "Section 302 Redemptions: Family Fights and Attribution," 61 A.B.A.J. 1272 (1975).

[19]*Tennessee Valley Authority v. Hill*, 437 U.S. 153, 195 (1978), the Supreme Court, in another statutory construction case, found that the following lines ascribed to Sir Thomas More by Robert Bolt were worthy of reflection.

"The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal. * * * I'm *not* God. The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm a forester

Accordingly, we conclude here that the redemption did not result in a meaningful reduction in the trust's proportionate interest in MDI for the purposes of section 301(b)(1). The trust's section 318(b)(3) argument rested on not applying section 318 to attribute the stock owned by Jacob to the trust after the redemption because of hostility among Jacob, Catherine, and Cecelia. Because family discord does not nullify the attribution rules, we hold that, except for the applicability of section 302(c)(2), the trust did not completely terminate its interest in MDI for the purposes of section 302(b)(3).

## *Issue 2*

Next, we must decide whether the statutory exception to the attribution rules applies in this case. Section 302(b)(3) provides that a complete redemption of all the stock of the corporation owned by the shareholder will be treated as an exchange entitled to capital gains tax rates. Section 302(c)(2) provides:

(A) In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary by regulations prescribes, files an agreement to notify the Secretary of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph.

Respondent contends that the attribution rules contained in section 318(a)(3) apply to attribute to the trust all stock owned directly and beneficially by Jacob as well as the stock owned beneficially by Jacob's children, David II and Nan, which would be attributed to the trust through Jacob. Section 302(c)(2),

---

* * * What would you do? Cut a great road through the law to get after the Devil? * * * And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? * * * This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down * * * d'you really think you could stand upright in the winds that would blow them? * * * Yes, I'd give the Devil benefit of law, for my own safety's sake. [R. Bolt, 'A Man For All Seasons,' Act 1, p. 147 (Three Plays, Heinemann Educational Books, Inc. 1967).]"

respondent contends, does not apply because it allows only an exception to the family attribution rules specified in section 318(a)(1) and not the trust attribution rules specified in section 318(a)(3). In this contention, respondent relies on the language of the statute and our decision in *Johnson Trust v. Commissioner*, 71 T.C. 941 (1979), wherein we stated;

Therefore, even though [the trust] waives the family attribution rules of section 318(a)(1) so that stock owned by [the beneficiary's] mother is not considered attributable to [the beneficiary], it has not waived, and cannot, under section 302(c), waive the provisions of section 318(a)(3)(B)(i) attributing to it stock owned by its beneficiary * * * [71 T.C. at 952.]

Because only the trust attribution rules of section 318(a)(3) have any application to this issue, it is those rules and not the family attribution rules of section 318(a)(1), which operate to treat the trust as owner of the stock still owned after the redemption by Jacob.[20] Thus, respondent argues that the trust could report the redemption as a complete termination of its interest in MDI only if it could avoid the trust attribution rules of section 318(a)(3). Respondent contends that the trust has failed in this because, although it may have performed the prerequisites of the exception by having no other interest in the corporation other than a creditor (sec. 302(c)(2)(A)(i)), by not acquiring any such interest within 10 years from the redemption (sec. 302(c)(2)(A)(ii)), and filing an agreement to notify the Internal Revenue Service of any acquisition within the 10-year period and to keep necessary records (sec. 302(c)(2)(A)(iii)), the exception applies only to section 318(a)(1) and not section 318(a)(3).

To the contrary, the trust contends that the issue of whether the filing of a waiver is effective to waive the attribution rules of section 318(a)(3)(B) was resolved in its favor by the Court of Appeals for the Fifth Circuit in *Rickey v. United States*, 592 F.2d 1251 (5th Cir. 1979), which held that an estate had validly waived the estate-beneficiary attribution rule of section 318(a)(3)(A), so that a redemption of all the shares actually owned by the estate qualified as a complete redemption under section 302(b)(3).

In the *Rickey* case, the corporation had 2,255 shares of common stock outstanding before the redemption. The decedent

---

[20]No arguments were made that there was any hostility between Jacob and his children, David II and Nan, such that their stock should not be attributed to him under sec. 318(a)(1)(A)(ii).

had been president and principal stockholder of the corporation and his 1,292 shares (approximately 57 percent) passed to his estate. Another 788 shares (approximately 35 percent) were owned by the decedent's children. The balance, 175 shares (approximately 8 percent), were owned by unrelated shareholders. The company's articles of incorporation required that upon the death of a deceased shareholder, the corporation be offered the option to purchase his shares at book value. All of the shareholders viewed the provision as requiring the company to purchase the stock. This policy was designed to insure that corporate control was maintained by those who were active in the business. The decedent's will, moreover, directed his executrix to tender his stock to the company for redemption pursuant to the articles of incorporation. The will further named as residuary universal legatees the decedent's three children. In accordance with the will, the executrix offered all 1,292 shares to the company, which redeemed them a few months later.

After the redemption, the decedent's children still owned 788 shares which were now approximately 82 percent of the outstanding stock (963 shares). The remaining 175 shares, now approximately 18 percent of the outstanding stock, were held by unrelated stockholders. The estate treated the distribution as full payment in exchange for the stock, with no capital gain recognized because the basis in the stock had been stepped up, pursuant to section 1014, to the fair market value of the stock on the decedent's date of death. In the year following the redemption the estate was closed, and all of the assets, including the redemption proceeds, were distributed to the decedent's children, one-third to each of the estate's beneficiaries.

Upon audit of the beneficiaries, the Internal Revenue Service determined a deficiency on the grounds that the distribution was essentially equivalent to a dividend. The deficiency was paid. Thereafter, the estate was reopened and the executrix filed the agreement required by section 302(c)(2)(A)(iii) to notify the Internal Revenue Service of any acquisition by the estate of a prohibited interest in the company within 10 years after the redemption. After the Internal Revenue Service denied their claims for refunds, the beneficiaries filed a refund suit in the United States District Court. Following a decision for the taxpayers (427 F. Supp. 484 (W.D. La. 1976)), the Government appealed.

On appeal to the Fifth Circuit, the Government argued that, because of the attribution rules, the redemption of all of the stock actually held by the estate did not qualify as a complete termination of a stockholder's interest under 302(b)(3). This was so because the 788 shares (82 percent of the outstanding stock) owned by the decedent's three children who were residuary beneficiaries of the estate at the time of the redemption were still constructively owned by the estate under section 318(a)(3)(A) which provides in part, "Stock owned, directly or indirectly, by or for * * * a beneficiary of an estate shall be considered as owned by the * * * estate." The Government further maintained that the application of all of the constructive ownership rules of section 318 were required by section 302(c)(1), and that the exception in section 302(c)(2) applied only to the *family* attribution rules of section 318(a)(1) and not the estate-beneficiary attribution rules of section 318(a)(3).

The Fifth Circuit held the estate effectively waived the attribution rules of section 318(a)(3) in order to qualify for a section 302(b)(3) redemption. The Court of Appeals rested its holding on three grounds: (1) It believed application of the literal language of the statute would not bring about a result more in consonance with the intent of Congress in enacting the attribution and waiver sections; (2) it was convinced Congress intended and desired enforcement proceedings to be accompanied by commonsense and basic principles of fairness; (3) it rejected a "crabbed reading" of the Code where the rationale for applying the law was absent and where application of the rule leads to inappropriately harsh results. Thus, where the estate was merely carrying out the provisions of the decedent's will, the Court of Appeals concluded that the decedent's death was not "a device to bleed out corporate profits at capital gains rates." 592 F.2d at 1258.

With due respect for the views of the Court of Appeals, we nevertheless disagree with its reasoning. As discussed earlier, the intent of Congress in enacting the attribution rules was twofold, (1) to prevent tax avoidance, and (2) to provide *definitive rules* and *precise standards* whereby attributions may be applied.[21] The Senate report gives an example of entity-

---

[21]"A distribution in complete redemption of a shareholder's stock will also result in capital gain. To prevent evasion of the complete redemption test a shareholder is considered as owning

beneficiary attribution which is analogous to the facts of both the *Rickey* case and this case.[22] That example, set out in the footnote below, shows Congress contemplated applying the entity-attribution rules to preclude eligibility for section 302(b)(3) treatment; and the paragraphs following the example show that Congress was referring to "members of a family" when discussing the waiver exception under 302(c)(2). The other references which we have found in the legislative history

---

stock held by members of his immediate family, or by partnerships, corporations and trusts which he controls. At the present time a possible opportunity for tax avoidance results where redemptions are effected in the case of family-owned corporations. To prevent tax avoidance, *but at the same time* to provide definitive rules for the guidance of taxpayers, your committee has provided precise standards whereby under specific circumstances, a shareholder may be considered as owning stock held by members of his immediate family (or by partnerships, corporations, or trusts which he controls)."

[H. Rept. 1337, 83d Cong., 2d Sess. 36 (1954), U.S. Code Cong. & Adm. News 4061 (1954). Emphasis added.]

[22]"Paragraph (3) (relating to termination of a shareholder's interest) corresponds to section 302(a)(3) of the House bill by providing that a distribution which is in complete redemption of all of the stock of a corporation owned by a shareholder shall be treated as a distribution in full payment for the stock of such shareholder. This paragraph must be read in connection with the provisions of subsection (c) of section 302 relating to constructive ownership of stock."

\* \* \* \* \* \* \*

"Subsection (c) of section 302, which corresponds in general to section 302(c) of the House bill, provides rules for determination of the constructive ownership of stock for the purpose of section 302.

"Paragraph (1) provides that the rules for constructive ownership of stock of section 318(a) shall apply for purposes of this section generally. *For example, if an individual owns half of the stock of a corporation, and a trust of which such individual is the sole beneficiary, owns the other half of such stock, a redemption of all of the stock of the corporation owned individually would not qualify under paragraph (2) or (3) of subsection (b). Under these circumstances, by reason of the application of section 318(a)(2)(B), such individual would be considered as owning all of the stock of the corporation, both before and after the redemption.*

"Paragraph (2) of subsection (c) provides special rules for application of section 318(a)(1) (relating to constructive ownership of stock between *members of a family* ) in the case of a distribution in redemption under paragraph (3) of subsection (b) (relating to termination of a shareholder's interest). Under subparagraph (A) of paragraph (2), it is provided that section 318(a)(1) shall not apply, i.e., stock owned by *members of the family* of the distributee would not be attributed to him immediately after the distribution in redemption, if the distributee himself has no interest in the corporation, including but not limited to an interest as officer, director or employee other than an interest as a creditor, and such distributee does not acquire such interest (other than stock acquired by bequest of inheritance) within 10 years from the date of distribution in redemption.

"Moreover, in order to qualify for nonattribution between *members of a family*, subparagraph (A)(iii) requires that the distributee, under regulations prescribed by the Secretary or his delegate, file an agreement to notify the Secretary or his delegate of any acquisition of any interest (other than by bequest or inheritance) within the 10-year period and to retain such records as the Secretary or his delegate may prescribe as necessary for the application of paragraph (2)."

[S. Rept. 1622, 83d Cong., 2d Sess. 235–236 (1954), U.S. Code Cong. & Adm. News 4872–4873 (1954). Emphasis added.]

discussing the 302(c)(2) exception to the attribution refer only to family attribution, never entity-beneficiary attribution.[23] As we read the legislative history, we think the application of the language of section 302(c)(2) which provides an exception to the family attribution rules of section 318(a)(1) and provides no exception for the entity-beneficiary attribution rules of section 318(a)(3), would be consistent with the intent of Congress in enacting those sections.

While we agree with the Fifth Circuit that "Congress intended and desired enforcement proceedings to be accompanied by commonsense and basic principles of fairness," we are also mindful of the Supreme Court's warning on judicial restraint:

Here we are urged to view the * * * Act "reasonably," and hence shape a remedy "that accords with some modicum of common sense and the public

---

[23]The rules of *family ownership* will not apply if the shareholder completely terminates his interest in the corporation and does not reacquire, other than by bequest or inheritance, an interest (other than an interest as a creditor), for a period of 10 years thereafter. * * * "

[H. Rept. 1337, 83d Cong., 2d Sess. 36 (1954), U.S. Code Cong. & Adm. News 4061 (1954). Emphasis added.]

"Subsection (c) makes clear that the rules of attribution of ownership provided in section 311 will be applicable in determining ownership of stock for the purpose of section 302. * * *

"Paragraph (2) of subsection (c) provides special rules for application of section 311(a) [now section 318] applicable solely to a distribution in redemption in termination of a shareholder's interest otherwise qualifying under paragraph (3) of subsection (a). It is intended by paragraph (2) and (3) to clarify the consequences of a complete redemption of a shareholder's interest where *family ownership* obtains so that the administration of this problem presently uncertain under section 115(g)(1) of existing law may be definitive.

"Subparagraph (A) of paragraph (2) provides that the rules of *family attribution* under section 311(a) shall not be applicable if immediately thereafter the distributee has no interest in the corporation (including an interest as an officer, director, or employee but not including an interest as a creditor) and under subparagraph (B) of paragraph (2) such distributee does not acquire any such interest in a corporation within 10 years from the date of the distribution in redemption. * * * "

[H. Rept. 1377, *supra* at A75, U.S. Code Cong. & Adm. News 4212 (1954). Emphasis added.]

"If a shareholder desires to sever completely his interest in a corporation which he and his family control, the *rules of family ownership* are waived, as under the House bill, if the shareholder does not reacquire, other than by bequest or inheritance, an interest (other than an interest as a creditor), for a period of 10 years thereafter. However, such a shareholder may not have made or received a gift of stock of the corporation, to or from his wife, for example, within 10 years prior to the distribution. If any interest is reacquired by a shareholder within the prohibited period, an additional tax may be recovered as if the original distribution had been a dividend. Thus modified the *family attribution* rules will be applied to insure a bona fide severance of a particular shareholder's interest in an enterprise and will not apply where there is no purpose of tax avoidance."

[S. Rept. 1622, 83d Cong., 2d Sess. 45 (1954), U.S. Code Cong. & Adm. News 4676 (1954). Emphasis added.]

weal." * * * But is that our function? * * * Congress has spoken in the plainest of words, * * *

Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. [*Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194–195 (1978).]

The *Rickey* opinion has, in effect, added a new provision to the Internal Revenue Code.[24] Section 302(c)(2)(A) states, in part, "In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if * * * ." The Fifth Circuit has rewritten that provision to read "section 318(a)(1) *and section 318(a)(3)* shall not apply if * * * ." The Supreme Court has held, "There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted. * * * Perhaps the wisdom we possess today would enable us to do a better job * * * than Congress did [years ago] * * * but even if that be true, we have no authority to substitute our views for those expressed by Congress in a duly enacted statute." *Mobil Oil Corp. v. Higginbotham, Administratrix*, 436 U.S. 618, 625–626 (1978). Where Congress has specifically excluded a term or phrase, it is not for the courts to read that term or phrase into the statute. *United States v. Moreno*, 561 F.2d 1321, 1322 (9th Cir. 1977). Such a rewriting of a statute, plain on its face, is an example of lawmaking as distinguished from statutory interpretation that is beyond the power of the courts. *Gaddis v. Calgon Corp.*, 449 F.2d 1318, 1319 (5th Cir. 1971). Accord, *Allen v. David*, 334 F.2d 592, 601 (5th Cir. 1964), cert. denied 379 U.S. 967 (1965).

Treating the redemption in the *Rickey* case as a distribution under section 301, rather than an exchange under section 302(a), may have seemed to the Fifth Circuit so inappropriately harsh as to violate basic principles of fairness. However, so long as the results do not violate the constitutional protections of due process and equal protection, "Whether a transaction or result is

---

[24]For a general analysis of the *Rickey* opinion, see A. Andrews, "Estate Waiver of the Estate-Beneficiary Attribution Rule in Nonliquidating Redemptions Under Section 302 and Related Matters: The *Rickey* Case in the Fifth Circuit," 35 Tax L. Rev. 147 (1979); Comment, "Stock Redemptions and the Estate-Attribution Rules," 128 U. Pa. L. Rev. 650 (1980); C. Fassler, "Waiver of Entity Attribution—The *Rickey, Jr.* Case," 57 Taxes 658 (1979).

taxable and what the tax is is not a matter to be determined in law upon considerations of general justice or equity. It is a matter of statutes and valid regulations, and what they mean." *Jeffries v. Commissioner*, 158 F.2d 225, 226 (5th Cir. 1946), cert. denied 330 U.S. 843 (1947).

The Fifth Circuit's third ground is stated as follows:

It cannot be argued that the estate's motivation in allowing this redemption was one of benefitting the beneficiaries. Rather the estate was merely carrying out the provisions of decedent's will—selling the shares back to the Corporation and distributing the proceeds to the beneficiaries, thereby terminating its control over the corporation. We will not find that decedent's death was a device to bleed out corporate profits at capital gains rates. [592 F.2d at 1258.]

Again, we respectfully disagree that the estate's motivation is relevant to the section 302 question. As the Supreme Court stated in *Davis*:

It was clearly proper for Congress to treat distributions generally as taxable dividends when made out of earnings and profits and then to prevent avoidance of that result without regard to motivation where the distribution is in exchange for redeemed stock.

We conclude that that is what Congress did when enacting § 302(b)(1) * * * [397 U.S. at 313.]

We think the irrelevance is equally applicable to section 302(b)(3).

The trust urges that the holding in the *Rickey* case should control our decision under the doctrine of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir.), cert. denied 404 U.S. 940 (1971). In *Golsen* we said that "better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." (54 T.C. at 757.)

Respondent argues that the *Golsen* rule applies only where the Court of Appeals has decided a case that is "squarely in point," citing *Cottrell v. Commissioner*, 72 T.C. 489, 492–493 (1979), and *Lerner v. Commissioner*, 71 T.C. 290, 297 (1978), as examples in which this Court did not apply the rule where the cases were distinguishable from the appellate precedents in the circuits to which an appeal would lie. He contends that *Rickey* can be distinguished on the basis of the redemption option in the articles of incorporation and the corresponding direction in the decedent's will. The trust in the present case has no such similar provision requiring it to offer the shares to MDI prior to any

alternative disposition, nor do we have any evidence that the articles of incorporation of MDI required redemption.[25]

We agree with respondent. The important distinguishing factor between the facts before the Fifth Circuit in *Rickey* and those in the present case is that the redemption in *Rickey* was required by the decedent's will[26] and the articles of incorporation of the redeeming corporation.

The Fifth Circuit pointed out that the estate's motivation in proceeding with the redemption was not to benefit the beneficiaries, but to carry out the provisions of the decedent's will. By contrast, the redemption in the present case was effectuated solely to accomplish the objectives of the beneficiaries, which were to split up the separate family businesses so that there would not be any further family discord during board of directors and stockholders meetings over the proper operation of the businesses.

In *Rickey*, the Court relied on the fact that the corporate policy of purchasing a deceased shareholder's interest in the corporation through redemption was designed to insure that control of the company was maintained in the hands of those who were active in the business. In the present case, the David Metzger Trust had been a passive stockholder for at least 20 years, from David Metzger's death in 1953 until the redemption in 1973.

For these reasons, we think the *Rickey* case is not "squarely in

---

[25]Respondent suggests on brief that the trust (not being required to offer the shares to MDI, itself) and the beneficiaries could have achieved favorable tax treatment by dissolving the David Metzger Trust, making in-kind distributions of the MDI stock to the respective beneficiaries and then have MDI redeem Catherine's, Cecelia's, and Nora's stock. (As it later turned out, Cecelia disclaimed her interest in the David Metzger Trust on Aug. 10, 1976, and Catherine did the same on Oct. 12, 1976.) The individuals could then have followed the procedures of sec. 302(c)(2) so that Nora's stock would not be attributed to her daughters, Catherine and Cecelia, or vice versa, thus permitting Nora, Catherine, and Cecelia to qualify for capital gains treatment under sec. 302(b)(3). See Rev. Rul. 79–67, 1979–1 C.B. 128. On brief, the trust agreed with this suggestion but contended that because the beneficiaries did not obtain proper advice as to the potentially differing tax consequences of the alternative courses of action, they fell into a "trap for the unwary." Regarding the actual facts of the present case, however, "Taxation deals not with what was attempted to be done but with what was done." *Jeffries v. Commissioner*, 158 F.2d 225, 226 (5th Cir. 1946), cert. denied 330 U.S. 843 (1947).

[26]It would appear that a minor amount of pre-death planning would enable all estates under the *Rickey* rule to avoid the attribution rules. One commentator has suggested the waiver of entity sanctioned by *Rickey* may even apply to redemptions required in employment agreements and buy-sell agreements. C. Fassler, "Waiver of Entity Attribution—The *Rickey Jr.* Case," 57 Taxes 658, 662 (1979).

point" concerning the present case, and thus, the *Golsen* rule need not be applied. Accordingly, we hold that the agreement filed by the trust was ineffective to waive the attribution rules of section 318(a)(3). *Johnson Trust v. Commissioner*, 71 T.C. 941 (1979).

### Issue 3

The final issue is whether MDI may properly deduct for the fiscal years ended September 30, 1973, September 30, 1974, and September 30, 1975, despite section 267, accrued interest paid to Cecelia, a cash method taxpayer, more than 2½ months after the close of MDI's fiscal years.

MDI redeemed Cecelia's stock with a promissory note dated January 22, 1973, in the original principal amount of $627,110.53. The terms of the note provided for payment in three equal annual installments, together with interest, beginning January 22, 1974. MDI performed in accordance to the terms of the note, making payments in January 1974, 1975, and 1976. MDI, an accrual method taxpayer, claimed deductions for accrued interest expense, with respect to the note, for its taxable years ended September 30, 1973, 1974, and 1975. Because such interest was not actually paid within 2½ months after the end of the taxable years in question, and, because Cecelia was a cash method taxpayer, respondent determined that the deductions claimed by MDI for the taxable years in issue should be disallowed pursuant to section 267(a)(2). Since Cecelia owned no MDI stock after the redemption, respondent's contention is premised on the attribution to Cecelia, under section 267(c), of the MDI stock owned by her brother, Jacob.

MDI, however, asserts that family discord is a relevant factor to be considered in the application of the family attribution rules of section 267(c). It contends that the section 267(c) attribution rules should be ignored in situations where the discord is so severe as to establish that the pertinent family members would not act in concert or for the benefit of each other.

Section 163(a) allows a deduction for interest which is either paid or accrued during the taxable year on indebtedness owed by the taxpayer. Thus, the proper accrual of interest expense on indebtedness of the taxpayer will result in the allowance of a deduction under section 163, notwithstanding the absence of an actual payment of such interest during the taxable year.

However, certain exceptions to the general rule of section 163 have been enacted to prevent the use of this provision as a tax avoidance device. One such exception is set forth in section 267, which provides, in pertinent part, as follows:

(a) DEDUTIONS DISALLOWED. —No deduction shall be allowed—

\*  \*  \*  \*  \*  \*  \*

(2) UNPAID EXPENSES AND INTEREST. —In respect of expenses, otherwise deductible under section 162 or 212, or of interest, otherwise deductible under section 163,—

(A) If within the period consisting of the taxable year of the taxpayer and 2½ months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and

(B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(C) If, at the close of the taxable year of the taxpayer or at any time within 2½ months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b).

The congressional purpose underlying the enactment of the predecessor of section 267 was to prevent the use of the differing methods of reporting income for Federal income tax purposes in order to obtain artificial deductions for interest and business expenses. It was recognized that there were instances where an individual on the accrual method became indebted to a creditor with whom he enjoyed a special relationship, such as a member of his family, or to a corporation he controlled, and his creditor reported income on the cash method. Thereafter, as interest became due on the debt, the debtor on the accrual method reported the interest as a deduction for income tax purposes, but he did not make any actual payment to his creditor. Since the creditor was on the cash method, he reported no income. The debtor would consequently gain the benefit of a current deduction, whereas the related creditor would defer income recognition until the year of receipt of actual payment. Sometimes the sum involved would escape income taxation altogether

because the payment was timed to a year when the creditor had offsetting losses.[27]

As provided in section 267(a)(2)(C), the limitations on the deductibility of interest and other expenses imposed by section 267(a) are applicable only in situations involving a taxpayer and another person or entity having a specified relationship, set forth in section 267(b)(2), as "an individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual." For purposes of determining the existence of such relationship, section 267(c) sets forth the following rules of constructive ownership of stock:

(c) CONSTRUCTIVE OWNERSHIP OF STOCK. —For purposes of determining, in applying subsection (b), the ownership of stock—

\*     \*     \*     \*     \*     \*     \*

(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

\*     \*     \*     \*     \*     \*     \*

(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendents; \* \* \*

Since the Supreme Court's decision in *McWilliams v. Commissioner*, 331 U.S. 694 (1947), courts have adopted a literal approach with regard to section 267, whereby a deduction encompassed within the scope of the statute has been disallowed without consideration of other mitigating circumstances. Section 267 and its predecessor, section 24(b), I.R.C. 1939, prohibited not only unpaid expenses and interest but also losses from sales or exchanges between certain related parties. The *McWilliams* case concerned the latter provision and held that section 24(b), I.R.C. 1939, provided an absolute prohibition against the allowance of losses on any sales between members of certain designated groups.

MDI maintains that the cases in which *McWilliams* has been cited or followed have focused principally on the strict application of section 267(a) to the specific interest or expense deduction in question and never on the relationship between the

---

[27]H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704, 724–725. See also *Young Door Co. v. Commissioner*, 40 T.C. 890, 893 (1963); *Geiger & Peters, Inc. v. Commissioner*, 27 T.C. 911, 917 (1957); *Platt Trailer Co. v. Commissioner*, 23 T.C. 1065, 1068 (1955).

attribution rules of section 267(c) and the operative provisions of section 267(a) and (b). In view of the similarity of section 267(c) to section 318,[28] MDI contends that, where hatred and disharmony exist between the related parties, the initial focus in applying section 267 should be on whether to apply the attribution rules at all. Petitioners contend that not only were the attribution rules of sections 267 and 318 intended to be similarly applied, but also that section 267 was not enacted by Congress in order to prevent the avoidance of Federal income taxes in situations involving extreme discord and hatred between siblings. MDI does not argue that mere lack of a tax-avoidance motive in executing the promissory note to Cecelia and in paying the principal and interest more than 2½ months after the end of its fiscal year should preclude the disallowance of the interest deduction. Rather, it contends that the extreme discord and hatred existing between Jacob and Cecelia prevented such parties from enjoying the requisite "special relationship"[29] intended by Congress as a condition precedent to the application of the disallowance provisions of section 267(a). In other words, it argues that the family discord nullified the attribution of stock ownership from Jacob to Cecelia and thus Cecelia lacked the relationship with MDI required by sections 267(a)(2)(c) and 267(b) as a predicate to the disallowance provisions of section 267(a).

We disagree. When the Supreme Court was interpreting section 24(b) of the 1939 Code, then in effect, in *McWilliams*, that section included both the operational sections now found in section 267(a)(1) and (b) *and* the attribution sections now found in section 267(c).[30]

---

[28]For a general discussion of the attribution rules in secs. 267, 318, and 544, see F. Ringel, S. Surrey & W. Warren, "Attribution of Stock Ownership in the Internal Revenue Code, 72 Harv. L. Rev. 209 (1958); B. Randall & K. Benson, "Family Dissension and the Attribution Rules of Sections 267, 318, and 544" 53 Taxes 534 (1975).

[29]H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704, 724–725.

[30]SEC. 24. ITEMS NOT DEDUCTIBLE.

(b) Losses From Sales or Exchanges of Property. —

(1) Losses disallowed.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

(A) *Between members of a family, as defined in paragraph (2)(D)*;

(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

(C) Except in the case of distributions in liquidation, between two corporations more than 50 per centum in value of the outstanding stock of each of which is owned, directly or

In the *McWilliams* case, the taxpayer managed the independent estate of his wife and on a number of occasions ordered his broker to sell certain stock for the account of one of the two, and to buy the same number of shares of the same stock for the other, at as nearly the same price as possible. On each occasion, the sale and purchase were negotiated through a stock exchange, and the identity of the persons buying from the selling spouse and the persons selling to the buying spouse was never known. The taxpayers contended that Congress never intended to disallow losses on such transactions which, having been made through a public market, were undoubtedly bona fide sales, and that disallowance of such losses would be tantamount to treating a husband and wife as a single individual for tax purposes.

The Supreme Court answered this objection to the attribution rules by saying:

> We are not persuaded that Congress had so limited an appreciation of this type of tax avoidance problem. Even assuming that the problem was thought to arise solely out of the taxpayer's inherent advantage in a contest concerning the good or bad faith of an intra-family sale, deception could obviously be

---

indirectly, by or for the same individual, if either one of such corporations, with respect to the taxable year of the corporation preceding the date of the sale or exchange was, under the law applicable to such taxable year, a personal holding company or a foreign personal holding company;

(D) Between a grantor and a fiduciary of any trust;

(E) Between the fiduciary of a trust and the fiduciary of another trust, if the same person is a grantor with respect to each trust; or

(F) Between a fiduciary of a trust and a beneficiary of such trust.

(2) STOCK OWNERSHIP, FAMILY, AND PARTNERSHIP RULE.— *For the purposes of determining, in applying paragraph (1), the ownership of stock —*

(A) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust, shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries;

(B) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

(C) An individual owning (otherwise than by the application of subparagraph (B)) any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner;

(D) *The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants*; and

(E) Constructive Ownership as Actual Ownership.— Stock constructively owned by a person by reason of the application of subparagraph (A) shall, for the purpose of applying subparagraph (A), (B), or (C), be treated as actually owned by such person, but stock constructively owned by an individual by reason of the application of subparagraph (B) or (C) shall not be treated as owned by him for the purpose of again applying either of such subparagraphs in order to make another the constructive owner of such stock.

[Emphasis added.]

practiced by a buying spouse's agreement or tacit readiness to hold the property sold at the disposal of a selling spouse, rather more easily than by a pretense of a sale where none actually occurred, or by an unfair price. The difficulty of determining the finality of an intra-family transfer was one with which the courts wrestled under the pre–1934 law, and which Congress undoubtedly meant to overcome by enacting the provisions of § 24(b). [331 U.S. at 698. Fn. ref. omitted.]

The Court specifically discussed the attributions rules and their strict application:

Section 24(b) states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions. [331 U.S. at 699. Fn. ref. omitted.]

Thus, the Supreme Court realized that some legally genuine intra-group transfers which resulted in economically genuine realizations of loss would be caught in this absolute prohibition. Because such intra-group transfers did not "usually" result in genuine economic realizations of loss, it held that Congress did not deem any of them deductible. *W. A. Drake, Inc. v. Commissioner*, 3 T.C. 33, 39 (1944), affd. 145 F.2d 365 (10th Cir. 1944).

In our opinion, the attribution rules should not be applied differently to the unpaid expenses and interest than as applied to losses from sales even where there is evidence of family discord. In *Radom & Neidorff, Inc. v. United States*, 150 Ct. Cl. 826, 281 F.2d 461 (1960), cert. denied 365 U.S. 815 (1961), a brother and sister each owned 50 percent of the outstanding stock of the taxpayer corporation. As a result of personal controversy, the sister refused to countersign the brother's payroll checks, and thus his salary was not paid within 2½ months after the close of the corporation's taxable year. The Court of Claims found that no actual or constructive payment had been received by the brother within the prescribed period, and thus held that section 267(a) was applicable irrespective of the absence of a tax avoidance motive.

Section 267, as interpreted by the Supreme Court in *McWilliams*, states an absolute prohibition. There is no mitigation of its attribution rules. *Miller v. Commissioner*, 75 T.C. 182 (1980).

It is true that a hardship may result in particular cases. Congress could have provided some exception for certain intra-family transactions. But it did not do so. It may be that such a qualification would have defeated the purpose of the measure, or it may be that consideration of administrative convenience in collecting revenue outweighed the occasional hardship which would result in particular cases. But, whatever the reason, we cannot, without indulging in judicial legislation, grant an exception to the broad provisions adopted by Congress. *Blum v. Commissioner*, 5 T.C. 702 (1945); *Miller v. Commissioner, supra*.

To reflect the concessions of the parties and our conclusions with respect to the disputed issues,

> *Decisions will be entered in all dockets under Rule 155.*

Reviewed by the Court.
CHABOT, J., concurs.

TANNENWALD, *J.*, concurring: While I agree that the stock owned by the beneficiary of the petitioner trust must be attributed to it, I reach this conclusion by a path other than that taken by the majority. I therefore concur in the Court's opinion only as to Issues 2 and 3.

As a result of a bitter family feud, the MDI stock held by the Metzger Trust (the trust) was completely redeemed. There is no question that this redemption would be "not essentially equivalent to a dividend" within the meaning of section 302(b)(1) were it not for the attribution rules of section 318. Those rules cause the trust to be the owner—albeit only constructively—of 100 percent of the MDI stock outstanding after the redemption and accordingly repel the trust from the gates of section 302(b)(1). The trust argues that the presence of the family feud should protect it from the clutches of section 318 and allow it access via section 302(b)(1) to the basis recovery and capital gains treatment of section 301(c)(2) and (3).

Whether a corporate distribution is essentially equivalent to a

dividend is a question of fact, although which factors may contribute to a court's finding is, of course, a question of law.[1] In *United States v. Davis*, 397 U.S. 301 (1970), the Supreme Court held that the corporate purpose behind a redemption should play no role in determining dividend equivalency under section 302(b)(1). To the extent, then, that the trust herein argues that the family feud demonstrates the bona fide business purpose of the corporate distribution, its argument is irrelevant under *Davis*.

The trust, however, seeks to benefit from the family disharmony in a different way. The attribution rules of section 318 provide that one individual or entity should be treated as the owner of stock in fact owned by another individual or entity because of the close relationship between the two. For example, parent/child, husband/wife, and trust/beneficiary relationships trigger constructive ownership by virtue of section 318. The underlying premise of these attribution rules is that, because of a sharing of interest and advantage, a nominal redemption might have the effect, not of a sale of shares to the corporation, but of a corporate dividend, and that the release of shares by the "redeemed" taxpayer might possess little substance because of shares retained by a related taxpayer. S. Rept. 1240, 88th Cong., 2d Sess. 7 (1964), 1964–2 C.B. 701, 705–706. The trust simply argues that family discord undermines the premises of the attribution rules and that they should not be applied when they belie reality.[2]

The Supreme Court held in *Davis* that the attribution rules of section 318 should be applied by a court when making a section 302(b)(1) determination, but it did not decide whether family discord may soften their application because that issue was not presented; the attribution in that case was between two happily married spouses and their children. The respondent would have us hold, however, that the broad language used in the *Davis* opinion should be read to foreclose *any mitigation* of the

---

[1] Sec. 1.302–2(b), Income Tax Regs.; *Wright v. United States*, 482 F.2d 600, 606 (8th Cir. 1973).
[2] See *Title Insurance & Trust Co. v. United States*, 484 F.2d 462, 465 n. 4 (9th Cir. 1973).

application of the attribution rules; admittedly, there is judicial support for this position.[3]

In *Robin Haft Trust v. Commissioner*, 510 F.2d 43 (1st Cir. 1975), the First Circuit held that *Davis* did not preclude the use of a family feud. In that case, as in the case at bar, the taxpayer/trust undoubtedly would have been entitled to the protection of section 302(b)(1) but for the section 318 attribution. However, the taxpayer in *Robin Haft Trust* could only be treated as a constructive owner of the redeeming corporation's stock if ownership could be attributed under section 318(a)(1)(A)(ii) from a father to his child, and the taxpayer there argued that the parent/child relationship was so strained that attribution was unreasonable. Accepting that the existence of family disharmony can outweigh the attribution rules, the Court of Appeals remanded for additional fact-finding as to the breakdown of the father/child relationship. See J. Boyd & M. Boyd, "Family discord may negate attribution rules and allow capital gain treatment of a redemption," 15 Taxation for Accountants 362, 364–365 (1975).

The respondent herein argues, despite the clear implication to the contrary of the language of section 1.302–2(b), Income Tax Regs.,[4] that *Robin Haft Trust* is inconsistent with *United States v. Davis, supra,* or that if it is not, it is nonetheless ill advised and should not be followed. Although the majority of this Court feels compelled to respond to these challenges, I would decline the opportunity to take so precipitous a step until required to do so, and the facts of this case make no such demand. Indeed,

---

[3] *Robin Haft Trust v. Commissioner,* 61 T.C. 398 (1973), and 62 T.C. 145 (1974) (supplemental opinion), revd. and remanded 510 F.2d 43 (1st Cir. 1975). Cf. *Niedermeyer v. Commissioner,* 62 T.C. 280, 286 (1974), affd. per curiam 535 F.2d 500 (9th Cir. 1976).

[4] Sec. 1.302–2(b), Income Tax Regs., states—

"The question of whether a distribution in redemption of the stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case. *One of the facts* to be considered in making this determination is the constructive stock ownership of such shareholder under section 318(a). [Emphasis added.]"

The Supreme Court in *United States v. Davis,* 397 U.S. 301 (1970), ignored this regulation except for a general reference to the regulation according with the view that section 318 "applies to all of section 302"—a reference which does not answer the question we have before us, namely, *the extent to which it applies.* See Comment, 55 B.U. L. Rev. 667, 674 (1975); Comment, 28 Maine L. Rev. 222, 237–239 (1976). In this connection, we note that, at one point in its opinion, the Supreme Court merely states that "Congress intended that they [the attribution rules] *be taken into account* wherever ownership of stock was relevant." See 397 U.S. at 307; emphasis added.

respondent on brief makes clear that the instant case can be disposed of on a narrower ground.

The trust herein is the constructive owner of 100 percent of the shares because its beneficiary, one Jacob Metzger (Jacob), is deemed to own them all. See sec. 318(a)(3)(B)(i). He is the actual owner of some, and is the constructive owner of the rest of the shares, which are actually owned by a trust, of which he is the beneficiary, and trusts for each of his children. See sec. 318(a)(2)(B)(i) and (a)(1)(A)(ii). There is no link in the chain from child's trust to child to father (Jacob) to the trust where disharmony exists; to the contrary, the only fight was between Jacob and his sisters, and no one is seeking to attribute stock ownership across those unfriendly lines.[5] To be sure, were the trust controlled by a trustee who was given substantial discretion and who thought ill of Jacob, this case might be fitted within the *Robin Haft Trust* mold. But here, Jacob was both the trustee of the taxpayer/trust and a beneficiary, and it seems obvious that Jacob could not be hostile to himself. Thus, all of the attribution rules relevant to the instant case accord with reality, and so their application herein is consistent with the rationale behind section 318. We need not decide whether we may or should ameliorate the application of the section 318 rules if justice would be served thereby, and I believe that a proper respect for the judicial function and its inherent limitations requires that we do not decide these questions before they are properly presented.

The majority apparently does not entirely reject the use of family discord. However, it limits such use to cases in which the taxpayer's actual and constructive ownership after the redemption is less than his actual and constructive ownership before the redemption, and only at that point is it used to determine whether such reduction was "meaningful." Yet, if a taxpayer's only ownership of stock after the redemption is purely constructive, and if the premise upon which that legal fiction was built is refuted by family discord, of what possible relevance can the *amount* of ownership fictionally attributed be? The Court today raises to the level of an essential prerequisite to rational factfinding a factor which, under the circumstances of this case,

---

[5]Somewhat ironically, attribution between siblings is not even authorized by the statute. See sec. 318(a)(1) and (a)(5)(B). Compare secs. 267(c)(4), 544(a)(2), and 554(a)(2).

seems wholly irrelevant, and thereby paves a road for objectionably arbitrary results.

Suppose a father and son jointly own a corporation until they have a bitter dispute, at which time the son is completely redeemed. If, before the redemption, they owned in the aggregate 100 percent of the corporation's outstanding stock, they each will be deemed to own 100 percent of the corporation after the redemption. Thus, the rule which the majority feels compelled to adopt would treat the redemption as essentially equivalent to a dividend under section 302(b)(1).[6] However, if a third party (say, an employee) owned as little as 1 share, the redemption would reduce percentage-wise the son's constructive ownership ever so slightly below that of his previous actual and constructive ownership, and thus he would now be free under the majority's rule to argue that the attribution rules should be overlooked because of the family feud.[7] Yet, it seems clear to me that whether or not a third party owns a minimal amount of stock has nothing whatsoever to do with the issue. How one should dovetail *United States v. Davis, supra,* with the views of the Court of Appeals in *Robin Haft Trust v. Commissioner, supra,* can be left for another day.[8] I would refrain from doing more than deciding this case solely upon the basis that the family hostility in this case does not preclude the application of section 318.

FAY, IRWIN, STERRETT, and HALL, *JJ.,* agree with this concurring opinion.

---

[6]In order to keep the hypothetical simple, I have ignored the waiver provisions of sec. 302(c)(2) which might be available to the son as I have posed the case. However, by simply modifying the facts in *Robin Haft Trust,* one can create a perfectly valid if somewhat complex situation involving a trust which would be analogous to the situation presented above.

[7]Cf. *Parker v. Commissioner,* T.C. Memo. 1961–176.

[8]See, e.g., A. Cathcart, "Section 302 Redemptions: Family Fights and Attribution," 61 A.B.A.J. 1272 (1975).